**In the Matter of Marvin STEIN, Bankrupt.**

No. 70 B 1068.

United States District Court, E. D. New York.

July 16, 1976.

Morris Weissberg, New York City, for appellant bankrupt.

Leinwand, Maron, Hendler & Krause, New York City, by Isidor E. Leinwand, New York City, for appellee trustee.

OPINION

NEAHER, District Judge.

On December 18, 1970, the bankrupt, Marvin Stein, filed a voluntary petition under § 59 of the Bankruptcy Act, 11 U.S.C. § 95, listing unsecured debts of $176,327.51 and virtually no non-exempt assets. On

September 10, 1971, the trustee filed specifications of objections to discharge, alleging that the bankrupt: (1) failed to maintain adequate books of account or records from which his financial condition might be ascertained, 11 U.S.C. § 32(c)(2);[1] and (2) failed to satisfactorily account for the loss and/or shrinkage of his assets, 11 U.S.C. § 32(c)(7).[2]

After holding hearings on the specifications on three separate days between February and September 1972, the bankruptcy judge filed his decision on January 30, 1973, upholding both specifications of objection and denying the bankrupt a discharge. The bankrupt thereafter moved unsuccessfully before the bankruptcy judge for an order reopening the hearing to allow him to adduce additional proof on his behalf. An appeal to this court followed.

At the hearing before this court, the bankrupt's attorney produced certain bank statements, cancelled checks and other evidence, which he represented he had been unable to produce at the hearings before the bankruptcy judge because they had been in the possession of the Trustee. Counsel for the Trustee consented to a remand to the bankruptcy judge to determine whether those records would cause him to alter his original decision. The remand was ordered by this court on December 5, 1973 and the bankruptcy judge held further hearings on April 16 and June 4, 1974. On September 12, 1974, the judge entered an order adhering to his original decision denying a discharge.

On March 14, 1975, the parties again appeared before this court to argue the appeal and counsel for the bankrupt announced that he had located in the court file further

evidence of which both parties and the bankruptcy judge were unaware. This court reserved decision on the appeal to allow the bankrupt to make an appropriate motion before the bankruptcy judge. The bankrupt thereafter moved for a rehearing based on newly discovered evidence. The judge denied this motion by order dated June 24, 1975.

On appeal to this court, the bankrupt argues that based on all of the evidence adduced at the original and remand hearings, the bankruptcy judge's decisions denying a discharge are clearly erroneous. Finding no error, this court affirms.

The evidence introduced at the hearings before the bankruptcy judge revealed that during the sixteen months preceding bankruptcy the bankrupt deposited in and withdrew from his *personal* checking account at the Irving Trust Company in excess of $360,000; $118,600 was withdrawn by checks payable to the order of either cash or himself and endorsed and cashed by the bankrupt or his agents. Also during this period, the bankrupt, who listed his occupation as the president of a "collections" agency, purchased a number of related businesses.

The bankrupt contends that the deposits reflected personal loans made to him, largely from non-institutional lenders. In his petition, the bankrupt listed in excess of two dozen individual creditors to whom he claimed to owe the bulk of the $176,000 in total unsecured debts. He maintains that the huge loss of assets over this relatively brief period is largely attributable to the usurious rates of interest he was paying on these personal loans. Similarly, he asserts that the $118,600 he withdrew personally

1. Section 32(c)(2) provides that a discharge shall be granted unless the bankrupt has

 "(2) *destroyed, mutilated, falsified, concealed,* or failed to keep or preserve books of account or records, from which his financial condition and business transactions *might be* ascertained, unless the court deems such acts

 or failure to have been justified under all the circumstances of the case;"

2. Section 32(c)(7) provides that a discharge shall be granted unless the bankrupt has

 "(7) failed to explain satisfactorily any losses *of assets or deficiency of assets to meet his* liabilities;"

from his checking account was used to purchase bank drafts with which he paid his personal creditors.

■ Under the law at that time, once the Trustee made out a *prima facie* showing, as was clearly done here on both specifications, the burden of ultimate persuasion shifted to the bankrupt. *Industrial Bank of Commerce v. Bissel*, 219 F.2d 624, 626 (2 Cir. 1955).[3]

■ The bankrupt contended unsuccessfully in the court below that his cancelled checks, check registers, bank statements and certain 5″ × 7½″ index cards with creditor accounts constituted adequate records from which his financial condition could be determined.[4] The bankruptcy judge found as a fact that the data submitted by the bankrupt did not "permit intelligent inquiry by the creditors." See *Karger v. Sandler*, 62 F.2d 80, 81 (2 Cir. 1932). This finding is amply supported both by the testimony of Ira Leichter, a certified public accountant engaged by the trustee (Tr. 7, 12, 15, June 29, 1972), and this court's independent review of the data, which reveals that at a minimum it is not possible to ascertain from those records, either the amount of money the bankrupt repaid creditors prior to bankruptcy, the amount he still owes them or the source of the deposits totalling in excess of $363,000.

The 5″ × 7½″ index cards, allegedly used to record creditor transactions, appear to be modified versions of cards used by the bankrupt in his "collections" business. Each card has handwritten on it the name of the bankrupt's creditor, the amount borrowed, the total amount owed and the amount of the weekly payment to be made. It is not possible to ascertain from these cards with any degree of assurance, however, how many weekly payments were made by the bankrupt and consequently how much he continues to owe a particular creditor. In fact, amounts listed on the individual cards do not correspond to the amounts listed as owing individual creditors in the bankrupt's A–3 schedule.[5] Nor does

---

3. Bankruptcy Rule 407 became effective October 1, 1973, well after the bankruptcy judge's original decision in this case. It would obviously have been unjust to apply the new rule at the limited remand hearings.

4. He conceded that no books of original entry were kept.

| 5. Creditor | Amount listed in A–3 schedule | Amount owed per index card |
|---|---|---|
| Harry Karlin | $ 3,427.05 | $ 1,080.00 |
| Mel Goldstein | 21,057.00 | unascertainable |
| Arnold Reed | 3,387.00 | 1,245.00 |
| Allen Skulnick | 1,717.40 | 14,115.94 |
| Howard Schneider | 2,982.24 | 3,951.62 |
| Harold Cooper | 27,851.59 | –0– |
| Preston Kaufman | 4,559.16 | unascertainable |
| Fanny Richards | 668.48 | 1,285.80 |
| Paul Taylor | 29,299.30 | 34,340.00 |
| | | |
| Thomas Iverolino | $ 5,264.23 | unascertainable |
| Sylvia Goldstein | 1,329.78 | $ 2,460.55 |
| Norman Goldstein | 2,581.82 | 4,843.96 |
| David Landman | 3,953.21 | 2,284.00 |
| Norman Lichtenstein | 4,217.11 | unascertainable |
| Jacob Tschekow | 3,222.65 | " |
| Edward Steinberg | 7,849.14 | " |
| Charles Bernstein | 880.48 | 1,464.80 |
| Jerry Gold | 15,700.00 | unascertainable |
| Betty Gold | 856.00 | 3,960.73 |

it appear that there exist cards representing every individual creditor listed in the A–3 schedule.[6]

Given the extended period of time encompassed by the various hearings, it is not unreasonable to assume that were it possible to reconstruct the bankrupt's financial condition from existing records, the bankrupt's accountant would have done so and an appropriate offer of proof would have been made. Instead, the bankrupt's accountant, who testified for the first time at the remand hearings, had not prepared any schedules setting forth the bankrupt's financial condition [7] and in fact stated that he could ascertain the bankrupt's financial condition from the available data *only if he assumed that all of the deposits represented loans and the withdrawals repayments of loans* (Tr. 32–33, 4/16/74; Tr. 206, 220, 6/4/74).[8] He also admitted that he could not determine what portion of payments made to creditors represented interest (Tr. 208, 212, 219, 6/4/74).

Under these circumstances, the bankruptcy judge's finding that it was not possible to ascertain the bankrupt's financial condition from available data is not only not clearly erroneous, it is clearly correct.[9]

■ The bankruptcy judge was also justified in concluding that given "the scope and complexity of his business involvement," the bankrupt's failure to keep adequate records was not justified. As the judge correctly noted:

> "The bankrupt was not a mere wage earner. He was engaged in diverse, complex business ventures with money borrowed from individual lenders. In light thereof the inarticulate and almost studied indifference to maintain and produce appropriate records warrants a bar to discharge."

See *Baker v. Trachman*, 244 F.2d 18, 20 (2 Cir. 1957); *Matter of Underhill*, 82 F.2d 258, 259–60 (2 Cir.), *cert. denied sub nom. Underhill v. Lent*, 299 U.S. 546, 57 S.Ct. 9, 81 L.Ed. 402 (1936).

There is also support in the record for the bankruptcy judge's finding that the bankrupt had failed to satisfactorily account for the loss of assets. While the bankrupt explained that he used the $118,600 he withdrew personally from his checking account to purchase bank drafts with which he paid creditors, copies of bank drafts introduced into evidence totalled only $110,439.53,[10] leaving over $8,000 unaccounted for. The bankrupt explained that $6,000 of this discrepancy was paid in cash to creditors as extra interest. The bankruptcy judge was

---

**6.** Creditors listed in A–3 schedule as having lent money to bankrupt for whom there are either no index cards or no open index cards:

| Creditor | A–3 amount |
|---|---|
| Gerald Gordon | $2,500.00 |
| Sidney Naishtat | 885.00 |
| Warren Klein | 947.30 |
| Jacqueline Schmidt | 3,549.02 |
| Sol H. Erstein | 2,500.00 |

**7.** He did prepare a summary showing receipts and disbursements but that is far from sufficient since the source of deposits is not revealed.

**8.** Moreover, on questioning by the judge, the bankrupt's accountant admitted that he did not even have all of the cancelled checks for the relevant period and that without them no complete financial picture could be drawn (Tr. 39, 4/16/74; Tr. 199, 6/4/74). There is no excusable reason why, at that late date, he did not have all available data.

**9.** This does not appear to be a case where even the investment of substantial amounts of accountant time would produce a reasonably true financial picture from existing records. See *Goff v. Russell Company*, 495 F.2d 199 (5 Cir. 1974). Nor would the bankrupt merit such an opportunity in any event. See note 12, *infra*.

**10.** Moreover, two of the bank drafts totalling $666.65 were drawn to the order of Doris Broder, the bankrupt's sister, and two $500 checks were drawn to the order of the bankrupt himself.

free to discount this explanation and he apparently did so.

Furthermore, the bankrupt admitted that he paid Doris Broder, his sister, over $36,000 between March 1969 and January 1970. He testified that these payments represented loan repayments and that he still owed his sister money.[11] He explained that he did not list her as a creditor in these proceedings because theirs was a "brother-sister" relationship. Nonetheless, he contended that she charged him 100% interest on these loans and that he did not know her present address. Under these circumstances, the bankruptcy judge was certainly free both to attribute little, if any, weight to the bankrupt's explanations for questionable withdrawals[12] and to conclude, as he did, that he was not convinced of the bankrupt's good faith and businesslike conduct. See *Federal Provision Co. v. Ershowsky,* 94 F.2d 574, 575 (2 Cir. 1938); 1A Collier on Bankruptcy ¶ 14.60.

All of appellant's other contentions regarding the proceedings below have been considered and found without merit.

Affirmed.

---

**11.** This is confirmed by open index cards reflecting money still owed Doris Broder.

**12.** The bankrupt's credibility was further undermined by the fact, found by the bankruptcy judge, that he was dilatory in producing even those records he did produce.